E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
STEVEN M. ARKOW (Cal. Bar No. 143755)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6975
     Facsimile: (213) 894-6269
     E-mail:   steven.arkow@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>YOSSI ENGEL,<br><br>       Defendant. | No. CR 23-213-MEMF-1<br><br><u>GOVERNMENT'S SENTENCING POSITION</u><br><u>FOR DEFENDANT YOSSI ENGEL</u><br><br>Hearing Date: December 15, 2023 |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Steven M. Arkow, hereby files Government's Sentencing Position for defendant Yossi Engel.

     This Government's Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this

//

case, including the presentence report ("PSR"), and such further

evidence and argument as the Court may permit.

Dated: December 1, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 _____
                                 STEVEN M. ARKOW
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

Page

MEMORANDUM OF POINTS AND AUTHORITIES.................................2

I.    INTRODUCTION....................................................2

II.   OFFENSE CONDUCT.................................................4

III.  SENTENCING GUIDELINES CALCULATION..............................8

IV.   RESTITUTION.....................................................9

V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION....................10

      A.    The Nature and Circumstances of the Offense, the
            Seriousness of the Offense, and the Need to Provide
            Just Punishment All Support a 51-Month Sentence..........10

      B.    18 U.S.C. § 3553(a)(1)..................................12

      C.    A Guidelines Sentence of 51 Months Is Necessary to
            Afford Adequate Deterrence..............................16

      D.    Defendant's Personal Background Provides No Basis for
            a Downward Departure or Variance........................17

VI.   CONCLUSION.....................................................21

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

**Cases**

United States v. Cantrell,
  433 F.3d 1269 (9th Cir. 2006) ................................... 11

United States v. Knows His Gun,
  438 F.3d 913 (9th Cir. 2006) .................................... 11

United States v. Martin,
  455 F.3d 1227 (11th Cir. 2006) ................................. 16

United States v. Nichols,
  464 F.3d 1117 (9th Cir. 2006) .................................. 11

United States v. Rangel,
  697 F.3d 795 (9th Cir. 2012) ............................... 14, 15

**Statutes**

18 U.S.C. § 3553(a) ......................................... 10, 12

18 U.S.C. § 3663A............................................... 9

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1(a)(1)......................................... 8

U.S.S.G. § 2B1.1(b)(1)(K)...................................... 8

U.S.S.G. § 2B1.1(b)(2)(A)(i).................................. 8

U.S.S.G. § 5H1.12............................................. 20

U.S.S.G. § 4C1.1.............................................. 8

1          <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2   **I.    INTRODUCTION**

3          Defendant Yossi Engel ("defendant") cultivated a fraudulent

4   reputation, portraying himself as a business success, a trustworthy

5   and charitable person who induced victims to give him more than $25

6   million by lying about transactions to install security cameras and

7   develop real estate.  To gain the trust of victims, he sought

8   introductions and referrals within the Orthodox Jewish communities in

9   the Los Angeles and New York areas.

10         By exploiting the goodwill engendered by affinity within his

11  religious community, defendant, motivated by personal greed and

12  opportunism, defrauded victims.  Affinity fraud, like other financial

13  fraud, causes economic harm, but the harm to the particular community

14  impacted and society at large may be enhanced because the victims are

15  betrayed by someone they felt they shared a connection to and a

16  common bond.  Indeed, a defendant is uniquely able to gain the

17  confidence of his victims by taking advantage of that bond.  *See*

18  Christine Hurt, "Evil Has A New Name (and A New Narrative): Bernard

19  Madoff," 2009 Mich. State L. Rev. 947, 976 (2009) ("[M]any Ponzi

20  schemes can be described as affinity frauds, because community ties

21  and the victim's familiarity with other investors decrease skepticism

22  of the otherwise too-good-to-be-true promises of financial reward.").

23         Defendant perpetuated two fraudulent pitches:

24         (1) Defendant falsely represented that he needed funds,

25  purportedly to purchase security cameras and equipment that defendant

26  would install for his customers, and falsely promised that he would

27  repay the victims from fees generated from installation jobs; and

28

                                       2

(2) Defendant falsely represented that he needed funds to purchase property and apartment buildings in Israel to remodel and develop additional housing units, and falsely promised victims that he would then sell and share the profits from those developments with them.

But, as his victims came to learn the truth, defendant was not a successful businessman or trustworthy charitable congregant.  He was simply using other people's money to develop a false reputation for personal gain.

Fraud crimes that involve substantial financial losses warrant a commensurately significant sentence sufficient to deter imitators.  Fraud crimes that are manipulative, take money from multiple victims, and occur over a long period, likewise, warrant a commensurately substantial term of imprisonment to properly account for the seriousness of the crime.  This case warrants a substantial custodial term for these reasons.

Defendant's criminal conduct was harmful, repeated, and calculated.  The government therefore requests that the Court impose a guidelines sentence of 51 months of imprisonment (the low end of defendant's applicable advisory guidelines range), three years of supervised release, a $100 special assessment, and a restitution order to multiple victims in the total amount of $11,758,030.98.  This sentence serves the goals of sentencing and is necessary to deter not only defendant, but others from similar schemes.

1   **II.   OFFENSE CONDUCT[1]**

2         Defendant designed and solely carried out a substantial

3   investment fraud and Ponzi scheme that impacted multiple victims who

4   loaned funds to defendant based on false promises.  From about 2018

5   through the beginning of 2021, defendant solicited and borrowed

6   millions and millions of dollars from victims in the Orthodox Jewish

7   community, some of whom he befriended, based on false claims that

8   their money would be used to: (a) purchase and install security

9   camera equipment and (b) finance real estate development in Israel.

10  Defendant's actions caused more than $11 million in actual losses to

11  these victims.

12        Defendant, a resident of Los Angeles, California,

13  founded and was the sole owner of iWitness Tech, LLC ("iWitness"), a

14  company in the business of installing residential and commercial

15  security systems and cameras.  (PSR ¶14).

16        Defendant directed another person, identified as Individual No.

17  1, to solicit from other persons loans to and investments with

18  defendant and to serve as an intermediary between those persons and

19  defendant in connection with such loans and investments.  (PSR ¶15).

20        The scheme to defraud operated as follows:

21              a.   To meet prospective victims with Orthodox Jewish

22  communities and engender their trust, defendant cultivated a

23  _____

24        [1] Unless stated otherwise, all facts recited herein are based on
    the offense conduct as set forth in paragraphs 13-26 of the (revised)
25  PSR (Dkt. 51) and the stipulated factual basis in the plea agreement
    as set forth in paragraphs 17-21 of the plea agreement (Dkt. 19).
26  Defendant has not objected to the factual findings of the offense
    conduct in the PSR, and defendant stipulated to the factual basis set
27  forth in the plea agreement.  On September 25, 2023, the United
    States Probation Office ("USPO") filed the PSR (Dkt. 48).  On October
28  10, 2023, the USPO filed the (revised) PSR (Dkt. 51).  On May 3,
    2023, the government filed the plea agreement (Dkt. 19).

                                    4

reputation within the Orthodox Jewish community as a trustworthy and charitable person based on his activities as a member of an Orthodox synagogue in Los Angeles.  (PSR ¶16).

b.   Relying on the reputation he cultivated, defendant also sought introductions and referrals to other individuals in the Orthodox Jewish community from whom he would solicit loans and investments.  (PSR ¶17).

c.   Defendant also solicited, and directed Individual No. 1 to solicit, members of Orthodox Jewish communities (primarily in Los Angeles and New Jersey) to lend funds to and invest funds with defendant and defendant's company.  (PSR ¶18).

d.   Defendant made, and directed Individual No. 1 to make, false and fraudulent representations and promises to victims to induce them to lend and invest funds with defendant and defendant's company, including through the following two pitches:

(i)   Defendant's Company iWitness:  Defendant falsely represented that he needed funds, purportedly to purchase security cameras and equipment that he would install for iWitness's customers, and falsely promised that defendant would repay the victims from fees generated from installation jobs of defendant's security business; and

(ii)  Defendant's Real Estate Development in Israel: Defendant falsely represented that he needed funds to purchase property and apartment buildings in Israel to remodel and develop additional housing units, and falsely promised victims that he would then sell and share the profits from those developments with them. (PSR ¶19).

1              ii.   To induce victims to lend and invest money and to

2    provide his solicitations with a veneer of legitimacy, defendant:

3         a) often provided victims promissory notes signed by defendant

4    and sometimes guaranteed by Individual No. 1 that promised repayment

5    of the loan principal typically within weeks to six months plus

6    interest of typically between 10 and 60 percent on an annualized

7    basis;

8         b) represented that the promissory notes were secured by an

9    "obligation to I-Witness" based on iWitness's installation jobs with

10   customers, in some instances providing victims with false and

11   fraudulent iWitness invoices or invoice numbers purporting to show

12   iWitness' sales to customers;

13        c) provided victims with false contracts, pictures of apartment

14   plans and fabricated documents, such as property deeds and land

15   registry documents, purporting to show defendant's ownership of

16   certain apartments; and

17        d) in order to create the false impression and  create the

18   appearance that defendant had special connections and influence with

19   the mayor of Bnei Brak (a city near Tel Aviv, Israel, with a high

20   concentration of Orthodox Jewish residents) that would enable

21   defendant to fast track the approval and the permitting process to

22   build additional housing units in apartment buildings, defendant

23   provided victims a video showing defendant with the mayor, which

24   defendant falsely represented was a meeting at which the mayor

25   expressed support for defendant's projects.  (PSR ¶20).

26        Defendant knew the representations and promises he made and

27   directed Individual No. 1 to make were false because defendant:

28

6

iii.  did not intend to, and did not, use the victims' funds to conduct the business activities that defendant claimed he would use the funds for; and

iv.  knew that iWitness had not and would not perform the work documented in the invoices, which defendant had fabricated;

v.  did not own or develop the land reflected on the fabricated land registry and other documents he provided to the victims; and

vi.  had no special relationship with the Bnei Brak mayor.  (PSR ¶21).

e.  Instead, as defendant knew, he had used the victims' funds for his own personal benefit and lifestyle expenditures, and to make purported repayments to other victims in order to lull those victims into believing that their loans/investments were achieving the promised return through iWitness's business activities and defendant's Israeli real estate developments (rather than coming from new victims' funds) and dissuade those victims from complaining to law enforcement or seeking the immediate full return of their loan/investment.  (PSR ¶22).

f.  At the direction of defendant, the victims, relying on defendant's false and fraudulent representations and concealment of facts, sent funds, by interstate wire and check, to defendant's personal accounts and iWitness business bank accounts defendant controlled.  (PSR ¶23).

To further and conceal the fraudulent scheme, when defendant did not have funds to cover his obligations to the victims, defendant urged victims to postpone repayment and roll over their prior loans and investments into new loans and investments.  (PSR ¶24).

With respect to the specific conduct in Count One, on December 29, 2020, for the purpose of executing the scheme to defraud described above, defendant caused victim A.L. to wire $460,000 from A.L.'s personal bank account at U.S. Bank to an iWitness Community West Bank account ending in 2353 that defendant controlled by means of wire communications in interstate commerce. (PSR ¶25).

Through the fraudulent scheme described above, defendant caused more than 10 victims to pay more than approximately $25 million, and suffer actual losses of more than $11,000,000.  (PSR ¶26; *see also* Defendant's Exhibit App. 10, Defendant's Part One of Appendix 10, Volume Two, of Defendant's Appendices in Support of Reply to Opposition to Reconsideration of Detention Order, Dkt. 38, at 5).

**III. SENTENCING GUIDELINES CALCULATION**

The USPO calculated a total offense level of 24 based on the following calculations:

| | | |
|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
| Loss of more than $9.5 million but not more than $25 million | +20 | USSG § 2B1.1(b)(1)(K) |
| Offense involved 10 or more Victims | +2 | USSG § 2B1.1(b)(2)(A)(i) |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| Zero-Point Offender Reduction | -2 | USSG § 4C1.1 |
| Total Offense Level: | 24 | |

(PSR ¶¶35-48, at 9-10).

Based upon a total offense level of 24 and a criminal history category I, the USPO calculated an applicable advisory guidelines imprisonment range of 51 to 63 months.  (PSR at 3).

This USPO calculation is consistent with the plea agreement (Dkt. 19, ¶ 12 at 7-8), except even more favorable to defendant in light of the since-enacted 2023 U.S.S.G. § 4C1.1 for zero-point offender reduction, whereby defendant has been credited with an additional reduction of two levels not contemplated within the plea agreement which was filed on May 3, 2023 prior to the amendment.  The government concurs with this two-level reduction to offense level 24.

Defendant has not disputed any of the factual findings, offense level calculations, or the restitution amounts in the PSR.

The government has provided to defendant interview reports of the victims that illustrate how defendant's fraud has impacted their lives and imposed financial burdens.  Moreover, defendant's victims were not super wealthy or institutional investors, but middle-class citizens of the religious community.

**IV.  RESTITUTION**

Consistent with the PSR, the parties stipulated in the plea agreement that restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A and that the Court may order restitution to any victim of the offense and relevant conduct.  (Dkt. 19 ¶ 6; PSR ¶98, at 15).  The government concurs with the USPO's calculation that restitution should be ordered in the amount of $11,758,030.98 to the victims identified by the USPO in the (revised) USPO Recommendation letter

dated October 6, 2023 in the Confidential Victim List. (Dkt. 50 at 1-2).[2]

## V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government believes that a guidelines sentence is necessary to satisfy the statutory sentencing goals, and that a low-end sentence is sufficient, but not greater than necessary, to achieve those goals. In particular, a low-end end term of imprisonment of 51 months is necessary to account for the egregiousness of defendant's crimes, to justly punish him, and to deter would-be offenders from committing similar crimes.

Pursuant to the sentencing factors set forth in 18 U.S.C. § 3553(a), and consistent with the recommendation of the USPO, the government recommends that defendant be sentenced to 51 months in custody, that is, the low end of his uncontested applicable guidelines range (51-63 months), one year of supervised release, a $100 special assessment, and a restitution order of $11,758,030.98. (Dkt. 50 at 2).

### A.   The Nature and Circumstances of the Offense, the Seriousness of the Offense, and the Need to Provide Just Punishment All Support a 51-Month Sentence

The seriousness of the overall scheme, the magnitude of the loss, the number of individual victims who put their trust in and gave their money to defendant, and that the offense involved numerous and repeated fraudulent acts by defendant weigh in favor of imposing a substantial custodial sentence of 51 months.

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered

---

[2] A copy of the victim list with amounts of actual loss still owed in restitution was produced to defendant in discovery and to the USPO.

with the factors set forth in 18 U.S.C. § 3553(a).  See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006).  "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily designated factors in imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the
   history and characteristics of the defendant;

2) The need for the sentence imposed –

   (A)  To reflect the seriousness of the offense, to
        promote respect for the law, and to provide just
        punishment for the offense;

   (B)  To afford adequate deterrence to criminal
        conduct;

   (C)  To protect the public from further crimes of the
        defendant; and

   (D)  To provide the defendant with needed educational
        or vocational training, medical care, or other
        correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range
   established for the offense and the defendant as set forth
   in the Sentencing Guidelines;

11

5) Any pertinent policy statement issued by the Sentencing

Commission;

6) The need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty

of similar conduct; and

7) The need to provide restitution to any victims of the

offense.

See 18 U.S.C. § 3553(a).

While all the statutory sentencing factors support a significant custodial sentence in this case, such a sentence is most strongly supported here by the need for adequate general and specific deterrence and the seriousness of defendant's crime. The government believes that the factors set forth in 18 U.S.C. § 3553(a)(1) suggest custody of 51 months and that such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

**B.    18 U.S.C. § 3553(a)(1)**

18 U.S.C. § 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant. These factors warrant a sentence of 51 months imprisonment.

Defendant's scheme, which took in more than $25 million in proceeds, requires a serious sentence to deter others who might believe such a substantial sum of money incentivizes an enticing risk of likely not being prosecuted and sentenced to custody. Defendant faked invoices and invoice numbers to hoodwink victims into thinking defendant had lucrative sales contracts with customers to purchase and install security surveillance equipment. Defendant faked

12

contracts, pictures of apartment plans, and property deeds and land registry documents to hoodwink victims into thinking defendant owned and would build certain apartment units. Defendant faked a video showing defendant purportedly in a meeting with the mayor of a city in Israel, to trick victims into thinking that defendant had special influence with the city to fast track the approval and permitting process to build additional housing. Defendant directed another individual on defendant's behalf to solicit members of Orthodox Jewish communities to lend funds to defendant. Defendant directed this same individual to make false promises to victims. All the while, defendant knew the false promises, false documents, and video were bogus as defendant did not intend to and did not use the victims' money to conduct the business activities that defendant claimed he would use their monies for, that he would not perform the security surveillance work, per the fabricated invoices, that he did not own and did not develop the land on the fabricated documents, and that had no such special inside relationship with the mayor. Instead, by not using the victim funds as promised, but rather for personal benefit and lifestyle expenditures and to pay prior victims in order to lull them into believing that their loans were achieving the promised returns, defendant's criminal conduct defrauded at least 11 victims of more than $11 million in actual losses. (PSR ¶38). The scheme occurred over two years. As the scheme was collapsing and when defendant did not have the funds to cover his obligations to the victims, instead of owning up to his fraud and stopping, defendant urged his victims to postpone repayment and roll over their prior loans and investments into new ones.

1    Further, defendant carried out multiple deceptions that required
2  his deliberative planning and sustained attention over years and
3  convinced his victims, themselves businessmen and familiar with
4  lending money, that he was a successful and legitimate businessman.
5  This was not a one-time crime of opportunity or a single venture
6  where in an aberrant moment he thought he could repay a particular
7  victim.

8    Taking into account the extent and scope of the fraud, the loss,
9  the number of individual victims, defendant's receipt of funds from
10 individuals  -- individuals from his religious community whose favor
11 he gained and trust he betrayed -- and defendant's use of their funds
12 for personal use, which factors are accounted for in the applicable
13 advisory guidelines calculations, a 51-month sentence of imprisonment
14 is appropriate as a sufficient but not greater than necessary
15 sentence to accomplish the goals of sentencing.

16    The consequences of defendant's dishonesty are not only
17 financial but his victims endured an emotional cost.  Defendant's
18 greed hurt reputations and broke relationships in the communities he
19 solicited money.  Though the Court can order restitution, the
20 likelihood that defendant will ever repay more than a small portion
21 of the more than $11 million in losses he caused is slim.  Defendant
22 left the United States to move to Israel in early 2021, purportedly
23 for a fresh start to "start a new business" and "to pay [his victims]
24 back," (Romanoff Report,[3] at 14 of 21), but the government is not
25 aware that defendant has repaid his victims anything since then.  See

26
27 _____
28    [3] Defendant provided a psychologist evaluation, in the form of a
   letter dated September 5, 2023, from Richard I. Romanoff, Ph.D., a
   licensed psychologist (Dkt. 54) ("Romanoff Report").

<u>United States v. Rangel</u>, 697 F.3d 795, 803-804 (9th Cir. 2012) (while defendant's inability to pay is not an aggravating factor, district court could note such factor in "focus[ing] instead on the impact on the victims").

One victim (D.C.) invested and lost over $1.4 million of his father's money for both the security camera business and real estate projects.  The victim's father was incapable of investing on his own because he had serious medical afflictions.  This victim captured the significant of the impact: "The money [we] invested [for their father] with Engel was everything to [us]."  The victim had to look for extra work because he "was having trouble paying for [his] house.[4]

Meanwhile, defendant had legitimate opportunities for steady employment.  For ten years, defendant had a business in surveillance security.  (PSR ¶66).  However, he chose to use his relationships and skills to commit fraud.

Defendant caused harm to multiple victims.  He did so intentionally.  Only now, after having been arrested while at Los Angeles Airport about to board a flight back to Israel and facing considerable prison time, has defendant admitted that he committed criminal fraud.[5]

---

[4] The interview report of victim D.C. was produced to defendant in discovery and also provided to the Probation Office.  (USAO_ENGEL_ 697-698).

[5] Defendant could best demonstrate his contrition by assisting the government in tracing any recoverable assets for victims.  To date, he has not done so.

15

1

2

### C.   A Guidelines Sentence of 51 Months Is Necessary to Afford Adequate Deterrence

3        The need for general deterrence is paramount in this case.

4    Economic crimes like defendant's are deterrable so long as they are

5    met with a commensurate term of imprisonment.  In drafting § 3553,

6    Congress specifically confirmed that "[t]o deter others from

7    committing the offense ... is particularly important in the area of

8    white collar crime."  S. Rep. No. 98-255, at 76 (1983), reprinted in

9    1984 U.S.C.C.A.N. 3182, 3259.  Congress was particularly concerned

10   with the fact that "[m]ajor white collar criminals often are

11   sentenced to ... little or no imprisonment," which the offenders

12   disregard as "a cost of doing business."  Id.  A guidelines sentence

13   is necessary to ensure those costs for the next would-be Ponzi

14   schemer outweigh the potential benefits.

15       The profile of white-collar criminals also demonstrates the

16   increased value of general deterrence.  "Because economic and fraud-

17   based crimes are 'more rational, cool, and calculated than sudden

18   crimes of passion or opportunity,' these crimes are 'prime

19   candidate[s] for general deterrence.'"  United States v. Martin, 455

20   F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-

21   Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L.

22   Rev. 721, 724 (2005)).  Further, given the challenges in uncovering

23   fraud offenses and proving that they are fraud, as opposed to

24   unsuccessful business ventures, particularly, in light of limited and

25   over-burdened investigative resources in Los Angeles, the need for

26   general deterrence in white-collar cases is fundamental.

27       Sentences recently imposed by federal courts nationwide, and

28   across a range of large Ponzi schemes, confirm that a sentence of 51

1  months of imprisonment fits the crime in this case.  <u>See</u> Comparative

2  Sentencing Date (from United States Sentencing Commission Judiciary

3  Sentencing Information (JSIN) platform (during last five fiscal

4  years, similarly situated fraud offenders with same offense level and

5  criminal history received, on average, 51 months) (PSR ¶100).

6       A 51-month sentence would provide the sort of corrective

7  envisioned by Congress and the U.S. Sentencing Commission.  To

8  provide adequate deterrence the sentence should account both for the

9  ill-gotten gains of large-scale investment fraud schemes and the low

10 likelihood in uncovering and prosecuting them.  Defendant's

11 guidelines range appropriately takes into account these concerns, and

12 a low-end sentence of 51 months considers the need for general

13 deterrence.

14       **D.  Defendant's Personal Background Provides No Basis for a**
         **Downward Departure or Variance**

15

16      In mitigation, defendant submits a psychologist's report[6] that

17 describes defendant's escalating pattern of behavior that developed

18 "an out of control [sic] need to take money from others, that in

19 [defendant's] head he believed he could pay back." (PSR ¶¶71-74).

20 However, there is no indication that defendant: (1) did not

21 understand the wrongfulness of his actions at the time; or

22 (2) believed that he could repay his victims (other than by taking

23 more money from other victims, the classic *modus operandi* of a Ponzi

24 scheme).  Indeed, to the contrary, as even the psychologist's report

25 makes clear, defendant admitted "fabricating records and knowingly

26

27

28      [6] The psychologist met five times with defendant, all after
defendant committed the underlying criminal conduct and after
defendant was arrested.

17

lying about the reasons why he was borrowing money. . . . [and] [h]e indicated there was never any actual real estate deal in Israel, and he knew his company in the United States would never generate sufficient money to pay back the borrowers who became victims of his fraudulent activity." (Romanoff Report, at 14 of 21). Instead, with it so obvious, even by defendant's own admission, to see that "I always knew something was wrong," defendant opted to have a lifestyle "overspending" money, "indulged in unnecessary luxuries" and "just wanting to have fun." (Romanoff Report, at 8, 13, 14, 16 of 21) (emphasis added).

There was no documentation of any previous history of mental health diagnosis (or substance abuse) or treatment prior to the criminal activity. (Romanoff Report, at 2). Notwithstanding defendant's claim of multi-generational (or inter-generational) trauma and family dynamics relating to the absence of his father during his teenage years (PSR ¶¶71-74), defendant's childhood life before his father's incarceration, also for fraud, was "positive" (PSR ¶60). As an adult, defendant has been married to his wife since he was 22 and had the benefit of support and stability from his wife's family eventually owing a business where he sold security systems. (PSR ¶¶63-64).

To the extent any mental evaluation undertaken in 2023 can be relevant to sentencing defendant for crimes committed about five years ago, it should have focused on defendant's mental state at the time of his commission of the instant offense. However, the psychologist's interviews of defendant, all self-reported by defendant himself, occurred recently in 2023 with defendant intending them to be provided to the Court so that he could request a lower

sentence.  The psychologist was not present during the criminal activity, did not evaluate defendant during the criminal activity, and did not meet with any of the victims from whom defendant took money based on lies.[7]

In short, the defense evaluation conflates result with cause. It uses defendant's criminal conduct (result) as evidence that defendant's mental health and trauma led to his criminal conduct (cause).  The psychological conditions attributed to defendant should not be blamed as the cause of defendant's criminal behavior.  Other persons with depression or similar mental health conditions do not commit multi-million fraud and Ponzi schemes against others in their own religious community.  Defendant should not be held morally less accountable for his intentional acts, especially, given defendant's intelligence, education, and understanding of the wrongfulness of his conduct.

Defendant's claims appear for the first time in an evaluation[8] prepared for this sentencing by a privately paid-for psychologist.[9] While the report purports to be objective and impartial, it should not be overlooked that the psychologist provides a fee-based service

---

[7] The psychologist was provided by the defense with FBI interview reports of a handful of the victims, but not all victims, and most notably, he apparently did not review the interview of Individual No. 1, arguably a pivotal person whom defendant recruited to solicit money from others and to serve as an intermediary between defendant and those other victims, and himself a victim owed hundreds of thousands of dollars in restitution.  (PSR ¶¶15, 18-20; USPO Recommendation (Dkt. 50) at 1).

[8] The evaluation did not include any cognitive or personality assessments to establish the accuracy and credibility of the assertions relating to the reasons for defendant's behavior.

[9] Counsel for defendant informed the government that as of September 22, 2023, the psychologist received approximately $7,500 for a portion of his work and agreed to cap his fee at $15,000.

for convicted defendants, a purpose of which is to "produc[e] reports that focus on the presentation of mitigating factors for purposes of sentencing, and these reports have often led to dramatic improvements in overall case outcome" including influencing a judge's "decision to deviate from a more severe sentence."
http://richardromanoffphd.com/index.htm (in website's *Biography* section).  The psychologist advertises his services to "provide [criminal defense] attorneys with assistance in helping them to incorporate relevant mental health and substance abuse difficulties as they develop their overall case strategy." (in website's *Services Provided* section].

Most important, it should be noted that many criminal defendants, especially, in the Central District of California, have faced extraordinary family hurdles and experienced trauma, and are not granted a downward variance or departure.  As the guidelines state: "Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted."  U.S.S.G. § 5H1.12.  Nothing in defendant's background suggests he had no alternatives in life but to undertake "escapist coping mechanisms" to commit this crime (indeed, he had a wife, three children, and a business) or failed to grasp the gravity of his crime.  (Romanoff Report, at 2).  To the contrary, defendant's education and upbringing, particularly, the moral values instilled during studying and training in yeshiva (PSR ¶60) suggest he could have stayed on a law-abiding path other than the one he chose.  Thus, while defendant's betrayal of his upbringing and ethical education is not necessarily an aggravating factor warranting an upward variance or departure, neither should his

deviation from a law-abiding life be a mitigating factor to warrant a downward variance or departure from his guidelines sentence. Balancing the aggravating and mitigating factors in this case, a sentence at the low end of the guidelines range remains appropriate.

**VI.   CONCLUSION**

Based on the above reasons, the government requests that the Court impose a low-end guidelines sentence of 51 months of imprisonment, one year of supervised release, and a $100 special assessment, and a restitution order of $11,758,030.98.

**CERTIFICATE OF SERVICE**

I, **T. Montes**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☒ By email, as follows:

**Elyse Avelar USPO Los Angeles**

**(Roybal), California**

**213-894-6015**

Elyse_Avelar@cacp.uscourts.gov

☐ By messenger, as follows:

☐ By Federal Express, as follows:

This Certificate is executed on December 1, 2023, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

/s/
_____
**T. Montes**
Legal Assistant